

USCA Case #14-1061    Document #1489196    Filed: 04/21/2014    ...

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

```
- - - - - - - - - - - - - - - - - - - - - -
TEXAS EQUUSEARCH MOUNTED        )
SEARCH AND RECOVERY TEAM,       )
RPSEARCH SERVICES INC., and     )
EUGENE ROBINSON,                )
                                )    Case No.  14-1061
            Petitioners         )
                                )
                                )
        v.                      )
                                )
FEDERAL AVIATION                )
ADMINISTRATION,                 )
                                )
            Respondent          )
- - - - - - - - - - - - - - - - - - - - - -
```

## PETITION FOR REVIEW

Pursuant to Rule 15(a) of the Federal Rules of Appellate Procedure and 49 U.S.C. § 46110, Texas EquuSearch Mounted Search and Recovery Team ("Texas EquuSearch"), RPSearch Services Inc. and Eugene Robinson, hereby respectfully petition this Court for review of an order issued to them on February 21, 2014, by the Federal Aviation Administration ("FAA"). A copy of the order is attached as Exhibit 1 (the "Order").

The FAA's Order commands Petitioners to cease all use of radio-control model aircraft in connection with their volunteer, unpaid search-and-rescue efforts on behalf of the families of missing persons. The Order declares in no uncertain

terms that such operations are "illegal" and demands that Petitioners "stop immediately."

Since its founding, Texas EquuSearch has coordinated volunteer searchers in over 1,400 searches in 42 states and eight foreign countries, and has found over 300 missing people alive. In other less fortunate cases, the organization's efforts have recovered remains, helping families to end the agony of not knowing their loved one's fate, permitting closure, and enabling the human dignity of a funeral. When a disappearance is the result of a crime, early discovery of the victim's remains benefits the country's justice system by preventing deterioration of forensic evidence.

Texas EquuSearch and the other Petitioners have been using one specific technological innovation in its searches since 2005: model aircraft. A model aircraft, equipped with a camera, is perhaps the single most powerful search-and-rescue tool in the crucial early hours, and beyond. Indeed, to date, photographs taken by Texas EquuSearch volunteers using model aircraft have directly pinpointed the location of remains of eleven deceased missing people. The models have also helped direct volunteer resources in countless other searches -- to help volunteers avoid hazards on the ground, to facilitate resource allocation to areas of greatest interest, and to save time during the crucial early hours of the search.

Petitioners have standing to apply for review of the Order because of their substantial interest in the agency's declaration that their conduct is illegal and must be halted. *See* 49 U.S.C. § 46110(a). Since the date of the Order, Petitioners have not operated model aircraft for purposes of search-and-rescue activities, despite several instances in which the technology would have been of assistance in their searches for missing persons. The Order has had, and continues to have, an immediate and significant impact on Petitioners' day-to-day operations.

As reflected in various FAA public statements concerning model aircraft operation, the Order represents the agency's definitive position on the use of model aircraft and asserts the status of law with an expectation of immediate compliance. Additionally, although there is no agency process permitting further review of the Order, counsel for Petitioners wrote to the FAA's Chief Counsel on March 17, demanding that the Order be rescinded and providing 30 days' time for a response. A copy of that letter is attached as Exhibit 2. The FAA did not respond at all, thus confirming that the Order represents the agency's position.

Immediate review of the Order would confirm that there is no legal basis for the FAA to prohibit the operation of a model aircraft for volunteer search and rescue activities. As will be elaborated in the briefing that will be filed in this proceeding, the FAA has <u>never</u> issued a regulation concerning model aircraft

3

operation. On the contrary, over three decades ago it confirmed that these devices were not subject to any regulation, when it issued "voluntary" guidance on "Model Aircraft Operating Standards" in Advisory Circular AC 91-57 (June 9, 1981). AC 91-57 makes no distinction between model aircraft flown for hobby purposes and model aircraft flown for any other purpose. Nor is there an indication in AC 91-57 that any regulations, such as those relating to pilot certification or airworthiness, are applicable to radio-control model aircraft.

In 2007, the FAA declared for the very first time, in a policy memorandum, that model aircraft may not be operated "by persons or companies for business purposes." *See* "Unmanned Aircraft Operations in the National Airspace System," Docket No. FAA-2006-25714; Notice No. 07-01, 72 Fed. Reg. 29 at 6689 (Feb. 13, 2007) (the "2007 Notice"). This statement, issued as a policy statement and not pursuant to the Section 553 notice-and-comment rulemaking process under the Administrative Procedures Act, is not legally binding upon the public.

Even if the FAA's 2007 policy were somehow binding, which it is not, the operations conducted by the Petitioners fall outside of any restrictions articulated by the FAA in that policy. Texas EquuSearch, a Texas non-profit corporation registered as an I.R.C. Section 501(c)(3) non-profit pubic charity, does not use the model aircraft for a commercial purpose. The purpose is purely humanitarian: to

4

save a life when possible, and to ease the suffering of families by bringing closure when that life can no longer be saved. Families are never charged for searches, whether they involve the model aircraft or not. The model aircraft operator is an unpaid volunteer. The distinction that the FAA now draws between Texas EquuSearch's use of this technology, and that of a hobbyist, is entirely arbitrary and capricious, in violation of the Administrative Procedures Act and due process principles. There is no basis whatsoever, in law or policy, to prohibit the operation of a model aircraft for humanitarian search and rescue activities.

The FAA Order should be set aside because it is unlawful, arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with law.

Date: April 18, 2014            KRAMER LEVIN NAFTALIS & FRANKEL LLP

Brendan M. Schulman

1177 Avenue of the Americas
New York, NY 10036
Tel: (212) 715-9100
Fax: (212) 715-8220
Email: BSchulman@KramerLevin.com

*Attorneys for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2014, I caused a true and correct copy of

the foregoing Petition for Review to be served by overnight delivery (Federal

Express) upon the following persons:

Michael P. Huerta
Administrator
Federal Aviation Administration
800 Independence Avenue SW
Washington, DC  20591

Jerry M. Mellody
Chief Counsel (Acting)
Federal Aviation Administration
Office of the Chief Counsel
800 Independence Avenue SW
Washington, DC  20591

Date:  April 18, 2014

KRAMER LEVIN NAFTALIS & FRANKEL LLP

_____
Brendan M. Schulman

1177 Avenue of the Americas
New York, NY  10036
Tel: (212) 715-9100
Fax: (212) 715-8220
Email: BSchulman@KramerLevin.com

*Attorneys for Petitioners*

# EXHIBIT 1

From: Alvin.A.Brunner@faa.gov
Date: Feb 21, 2014 3:30:54 PM
Subject: Re: UA SAR activities
To: Gene Robinson <texhills@verizon.net>

Gene,

Tim Miller?  Our Tim Miller?  I wouldn't think so; probably someone from Hays Co
EMS I guess?  Also, permissions from who?  Land owners?

At any rate, latest word I have is the sUAS Rule is due out for public comment before
year's end.  As you said, such predictions have failed before.

Lastly, some changes have occurred but nothing regarding sUAS flight operations in the
lower 48.  As I have told you before, UAS operations that are not authorized violate part
91(and some others) and hence are illegal.  You, through NIST, have a COA to operate
that particular UAS in the prescribed airspace, and that's it.  SAR operations outside the
COA airspace that meet the Emergency COA (ECOA) criteria, can be requested and
approved in short order, even on the weekends & holidays.  I have not heard of you
requesting and ECOA, or anyone having trouble getting an ECOA within a day or so.
Have you had troubles applying for and getting one?  If so, I can help fix that.  On the
other side of the fence, if you are operating outside of the COA provisions, stop
immediately.  That is an illegal operation regardless if it is below 400ft AGL, VLOS or
doing volunteer SAR.

I understand the pressure to get sUAS integrated into the NAS is mounting, but it must
not be at the sacrifice of what is right or safe.

Best wishes,

Al B.

Alvin Brunner
Aviation Safety Inspector
NextGen Branch, UAS & AWOPM
817-222-5246
alvin.a.brunner@faa.gov

Any comments you may have on services provided are appreciated.
Please email feedback to:
http://www.faa.gov/about/office_org/headquarters_offices/avs/stakeholder_feedback/afs/r
egional
/

From:     Gene Robinson <texhills@verizon.net>
          ASW-220,Nextgen Branch
To:       Alvin A Brunner/ASW/FAA@FAA,
Date:     02/21/2014 01:45 PM
Subject:  UA SAR activities

_____

Al,

I am still flying volunteer search and rescue(SAR) missions with Texas Equusearch using
my company's RC planes with cameras for still imaging.  I know it has been some time
since we spoke about this.

We still operate under 400' AGL and VLOS, just as before.  I am also actively training
other groups to do the same kind of operations in a safe and effective fashion.  I would
like to know whether the FAA has changed its position on the use of this asset.

I often get requests from Tim Miller on very short notice and it is difficult to wait on
individual permissions without jeopardizing the mission, especially on the weekends and
holidays when offices are closed.

The new rules promised years ago have not materialized.  The new promised dates are
still years off while the demand for this activity remains high.   Under the circumstances,
I am just going to continue these operations unless you give me a legal reason not to.

Thanks for your attention to this matter.

Gene Robinson
RPSearch Services
www.rpsearchservices.org

# EXHIBIT 2

# KRAMER LEVIN NAFTALIS & FRANKEL LLP

BRENDAN M. SCHULMAN
SPECIAL COUNSEL
PHONE 212-715-9247
FAX 212-715-8220
BSCHULMAN@KRAMERLEVIN.COM

March 17, 2014

<u>Via Certified Mail and Federal Express</u>

Marc L. Warren, Chief Counsel (Acting)
Office of the Chief Counsel
Federal Aviation Administration
800 Independence Avenue, SW
Washington, DC 20591

Re: FAA Order Prohibiting Texas EquuSearch Use of
<u>Model Aircraft For Volunteer Search and Rescue Activities</u>

Dear Mr. Warren:

We represent Texas EquuSearch Mounted Search and Recovery, RPSearch Services Inc. and Mr. Eugene Robinson (collectively the "Texas EquuSearch Team" or the "Team"), and write in response to an inconceivable order issued to them by an FAA official. That order directs the Team to cease all use of radio-control model aircraft in its life-saving volunteer search-and-rescue efforts. The FAA official has decreed in no uncertain terms that such operations are "illegal" and has demanded that the Texas EquuSearch Team "stop immediately."

We are aware of no administrative process affording further review of this order. However, we write in the hope that you will agree that the FAA's order is groundless and overturn it or direct that the Administrator rescind it immediately. Our review of the relevant statutes and regulations finds that <u>the civilian use of a model aircraft for purposes of a volunteer search-and-rescue effort is lawful and violates no existing aviation regulations</u>. The FAA announced a purported ban on "business" use of model aircraft (popularly called "drones" or by the technical term "UAS") in 2007, but that ban is not binding on the public because it is only a policy, not a regulation. Moreover, the use of model aircraft by Texas EquuSearch for <u>volunteer humanitarian purposes</u> falls outside of that ban. It is incomprehensible that the FAA would for decades raise no issue with respect to recreational operation of these devices but prohibit and deem "illegal" the exact same use for the purpose of saving the lives of missing children.

Because of the urgent nature of the humanitarian work performed by the Texas EquuSearch Team, in which the lives of missing persons are at stake virtually every day, we respectfully urge you to reverse or rescind this unlawful directive <u>within 30 days</u> (received by April 16) so that we may avoid resorting to legal remedies in the courts.

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Marc L. Warren, Esq.
March 17, 2014
Page 2

## The FAA's Cease and Desist Order

On February 21, 2014, after years of verbal harassment and telephone threats intended to stop Texas EquuSearch's use of model aircraft (detailed below), the FAA's position was communicated as a clear and direct written order. Exhibit A.

On that day, Mr. Robinson (the volunteer who operates model aircraft on behalf of the Team) wrote to Alvin Brunner, Aviation Safety Inspector at the NextGen Branch, UAS & AWOPM, to inquire about the legal status of his ongoing "volunteer search and rescue (SAR) missions with Texas EquuSearch using my company's RC planes with cameras for still imaging." Mr. Robinson indicated that he operates the model aircraft "under 400' AGL and VLOS [visual line of sight]," consistent with the FAA's own voluntary guidance in AC 91-57, and that he "often get[s] requests from Tim Miller," the founder of Texas EquuSearch.

The FAA official's response was to command him to "stop immediately." He continued: "That is an illegal operation regardless if it is below 400ft AGL, VLOS or doing volunteer SAR." *Id.* (Emphasis added).[1]

This order is no mere anomaly issued by a wayward official. It mirrors the FAA's current position, communicated from the highest levels of the agency in a remarkably adversarial tone, that model aircraft operated for any purpose other than recreation require "specific authority" and are subject to pilot and aircraft certification as "unmanned aircraft systems." *See, e.g.*, "Busting Myths about the FAA and Unmanned Aircraft–Update." Exhibit B.[2]

## Background - Texas EquuSearch

Texas EquuSearch Mounted Search and Recovery is a non-profit organization founded by Tim Miller, a resident of Texas whose daughter Laura was tragically abducted and murdered in 1984.[3] Mr. Miller has since devoted his life to assisting families whose loved ones have gone

---

[1] Mr. Brunner referred in his response to the Certificate of Authorization or Waiver process (COA) and Emergency COA process. However, those processes are irrelevant because they are only available to "public operators," *i.e.* federal and state government agencies or their contractors, and not to civilian volunteer search and rescue teams such as Texas EquuSearch, RPSearch Services or Mr. Robinson. While Mr. Robinson acts as the operator for the National Institute of Standards and Technology under a contract and pursuant to a fire research COA, search and rescue activity is completely unrelated. Mr. Robinson uses his own company's Spectra RC flying wing for search and rescue. NIST is not involved in Texas EquuSearch's search and rescue missions, nor is Mr. Robinson in a position to use the MLB Super Bat UAS owned by NIST for that purpose. His work with a COA-authorized federal agency in another context is irrelevant to these issues.

[2] *Available at* http://www.faa.gov/news/updates/?newsId=76381&omniRss=news_updatesAoc&cid=101_N_U (updated March 7, 2014).

[3] *See generally*, "A Profile of Tim Miller and Texas EquuSearch," Crime Library, available at http://www.crimelibrary.com/criminal_mind/forensics/texas_equusearch/1.html

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Marc L. Warren, Esq.
March 17, 2014
Page 3

missing, by organizing and directing volunteer searchers who, in coordination with local and federal officials, thoroughly search relevant land areas using a variety of volunteers, including horseback riders, boaters, divers, and field walkers, using any equipment and technology available that may effectively assist in the search (such as side-scan sonar and ATVs). Since its founding, Texas EquuSearch has been involved in over 1,350 searches in 42 states and eight foreign countries, and has found over 300 missing people alive. In other less fortunate cases, the search has recovered remains, helping families to end the agony of not knowing their loved one's fate, permitting closure, and enabling the human dignity of a funeral. When the disappearance is the result of a crime, early discovery of the victim's remains benefits the country's justice system by preventing deterioration of forensic evidence.

Texas EquuSearch has conducted searches at the request of the families in the notable disappearance cases of Stacey Petersen (Illinois), Caylee Anthony (Florida), Natalee Holloway (Aruba), and Lauren Spierer (Indiana), and has also participated in search and recovery efforts overseas, including in Sri Lanka after the 2004 tsunami. But it has also performed hundreds of searches for missing persons who never make national headlines. The organization's Mission Statement is enclosed as Exhibit C. That Statement, as well as a list of search missions, may also be reviewed on its website, http://texasequusearch.org. No family is ever charged a fee for these searches or asked for any reimbursement of the organization's costs (which are covered by donations).

The work of Texas EquuSearch is of unquestionable merit and value to the nation. Tim Miller is the recipient of the "Point of Light" Award by former President George W. Bush. He received the Jefferson award from the City of Houston. Additionally, he has been honored by the Texas Daughters of the American Revolution Community Service Award, with the National Daughters of the American Revolution Community Service Award, Crime Stoppers of Houston and countless other awards from all over the country. Mr. Miller was invited by former President George H.W. Bush, Jr., and attended, the first conference for the National Center for Missing and Exploited Children in Washington, D.C., and also the signing of the National Amber Alert system in Washington, D.C. He has been featured as the keynote speaker for the national conference for Parents of Murdered Children and has received many other accolades from across the nation for his dedication to families who are missing loved ones.

## The Needs of Our Communities

According to the FBI's National Crime Information Center, 627,911 persons were reported missing during the year 2013.[4] That is an average of over 1,700 persons each day. Many of those missing persons are at grave risk: lost children, stranded hikers, mentally ill, psychologically troubled or intoxicated individuals, or victims of abduction or other crimes. As

---

[4] See http://www.fbi.gov/about-us/cjis/ncic/ncic-missing-person-and-unidentified-person-statistics-for-2013

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Marc L. Warren, Esq.
March 17, 2014
Page 4

of December 31, 2013, 84,136 missing person records remained active. The large number of missing persons reported each day, and the challenges of searching in the vast open areas that make up a large part of our country's geography, overwhelm law enforcement and other taxpayer-funded resources. Volunteer organizations such as Texas EquuSearch are an essential component of community response to the needs of families who are missing loved ones. One of the core values of Texas EquuSearch is "Innovation – we will use the best available and suitable technologies, methodologies and training." Exhibit C.

Texas EquuSearch has been using one specific technological innovation in its searches since 2005: model aircraft. A model aircraft, equipped with a camera, is perhaps the single most powerful tool the Team can use in the crucial early hours of its search efforts. Flown in the same manner as a hobbyist's model, the model used by the Team can photograph a square mile in less than 10 minutes, enabling search planners to quickly focus on areas of interest, such as fresh tire tracks that are not readily visible on foot. The model aircraft's camera can spot items such as a shoe or a distinctly colored item of clothing that identifies traces of the missing person's location.

Indeed, to date, photographs taken by the Texas EquuSearch Team model aircraft have directly pinpointed the location of remains of 11 deceased missing people. The models have also helped direct volunteer resources in countless other searches -- to help volunteers avoid hazards on the ground, to facilitate resource allocation to areas of greatest interest, and to save time during the crucial early hours of the search.

## The FAA's History of Verbal Harassment of the Texas EquuSearch Team

Despite these clear and indisputable humanitarian benefits, for several years, various officials at the FAA have, orally by telephone, harassed and interfered with members of the Texas EquuSearch Team before, during, and after search and rescue missions involving model aircraft. The following are just a few examples of instances in which FAA officials have made such calls to Texas EquuSearch volunteers or to local authorities. These past encounters have not involved written directives, thus carefully evading public scrutiny and legal review.

- **Jessie Marie Davis**, a 26-year-old nearly full-term pregnant woman, went missing from her Lake Township, Ohio home in June 2007. Among the FAA's statements to Texas EquuSearch volunteers were threats to the effect that "you really don't want to fly" and "it would be really bad if you flew."

- **Caylee Anthony**, a 2-year-old girl from Orlando, went missing in July 2008. An extremely high-profile search followed, including tireless efforts by Texas EquuSearch volunteers. This was one of the most extensive missing-person searches in U.S. history, with over 2,000 volunteers spread across miles of wilderness and swamps, risking encounters with snakes and

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Marc L. Warren, Esq.
March 17, 2014
Page 5

alligators.[5]  The FAA's Atlanta Flight Standards District Office called the on-location search director of Texas EquuSearch and demanded that model aircraft not be used in the search.

- **Chelsea King**, a 17-year-old, disappeared in February 2010 in San Diego after going for a run in a local park.  Texas EquuSearch was asked to assist.  The local FAA Flight Standards District Office contacted the San Diego Sheriff's Department Search and Rescue Unit in an attempt to prevent model aircraft from being used during the search.

- **Lauren Spierer**, a 20-year-old Indiana University student, disappeared in Bloomington, Indiana in June of 2011.  The search efforts attracted media attention and several of the news reports made reference to the use by the Texas EquuSearch Team of "drone aircraft."[6]  The FAA's telephone contacts with local authorities objecting to the operation of the model aircraft caused so much friction and confusion that Texas EquuSearch had no choice but to discontinue its <u>entire</u> search operation and return all resources to Texas.

- **Devon Davis**, age 2, went missing from his home in southwest Texas in April 2012.  After extensive search efforts had failed, and as Texas EquuSearch was planning to terminate the search, a model aircraft was used.  After a single 15-minute flight, the images captured by the camera, and reviewed by Mr. Robinson's wife on a computer, showed the red shirt Devon was wearing.  Devon's body was recovered in swampy water, mere feet from where searchers in kayaks had earlier passed by.  (Their view was blocked by vegetation.)  Although the model aircraft did not, in this case, save Devon's life, it gave his family closure and enabled a funeral.  Because of the presence of alligators in the water, had the body not been found by the model aircraft, it likely never would have been, and Devon's family would to this day not know what became of their child.[7]  In this instance, the FAA learned of, and complained about, the model aircraft operation after the search was completed.

FAA officials have interfered with the good work of Texas EquuSearch and have harassed its unpaid volunteers, in these situations and many others, despite the absence of any legal basis for doing so.

---

[5] *See* "The Search For Caylee Anthony, 'America's Little Girl,'" Huffington Post, July 4, 2011, available at http://www.huffingtonpost.com/2011/07/04/caylee-anthony-search_n_889859.html

[6] *See* "Texas-Based Search Team Assisting in Lauren Spierer Case," WIBC Fox News, available at http://www.wibc.com/news/story.aspx?ID=1440303 ; "Spierer Case Generates New Tips, More Searchers," RTV Channel 6, available at http://www.theindychannel.com/news/spierer-case-generates-new-tips-more-searchers (quoting Tim Miller as saying " We do a lot of stuff with our drone airplane.").

[7] The search efforts are described in detail in a documentary, *Civilian Drones*, available for viewing at http://www.civiliandronesmovie.com/

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Marc L. Warren, Esq.
March 17, 2014
Page 6

## The Team's Model Aircraft and its Operation

The model aircraft used by the Texas EquuSearch Team resembles, in construction and operation, a hobbyist's radio-control model aircraft. The Spectra, designed by RPFlight Systems, Inc., is constructed of foam and plastic, uses a battery-powered motor, and weighs under five pounds. Exhibit D. It is controlled, within the visual line-of-sight of the operator, using a Futaba 9C radio system, the same type of radio control system that has been used by hobbyists for decades.

The model aircraft used in search and rescue is provided without charge by RPSearch Services Inc., a section 501(c)(3) non-profit corporation, and its operation is controlled by Gene Robinson, who volunteers his time to Texas EquuSearch. A video showing Mr. Robinson's typical operation of the model aircraft may be viewed at http://youtu.be/UTcWo4OAwtA [8]

The Texas EquuSearch Team always coordinates with local law enforcement and other emergency responders to ensure that the model aircraft is not operating during times when there may be manned aircraft in use as part of the search effort. In many instances, local rescuers have no access to manned aircraft or helicopters and the model aircraft represents the only option for obtaining an aerial view of locations that need to be searched as soon as possible.

Moreover, the Team is guided by its own stringent safety parameters, contained in RPSearch Services' Field Operations Procedures. Exhibit E. These procedures, which concern mission planning, launch and landing zones, preflight checklists, airspace clearance, and more, are a comprehensive improvement on the rudimentary voluntary guidance provided by the FAA to model aircraft operators in 1981 in Advisory Circular 91-57 ("AC 91-57"). They go far beyond the typical safety precautions taken by hobbyist model aircraft operators, whose operation of model aircraft for recreational purposes the FAA has expressly allowed for decades. There is no question that the Team's model aircraft operations are safe and responsible.

## The Absence of Enforceable Regulations

The FAA has never issued a regulation concerning model aircraft. On the contrary, over three decades ago it expressly confirmed that these devices were not subject to federal aviation regulations. On June 9, 1981 the FAA released AC 91-57 which provided "voluntary" guidance on "Model Aircraft Operating Standards," such as the request that model aircraft operators fly their devices below 400 feet.[9] AC 91-57 makes no distinction between model aircraft flown for

---

[8] In the video, Mr. Robinson refers to the search diameter as one half to one full mile, approximately a distance of between 1200 and 2500 feet from the operator who is flying visual line-of-sight.

[9] It is questionable whether the FAA has authority to regulate conduct at lower altitudes. Congress delegated to the agency only the power to regulate conduct in "navigable airspace," defined generally in 15 C.F.R. § 91.119 as the airspace above 500 feet AGL and approach paths to airports.

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Marc L. Warren, Esq.
March 17, 2014
Page 7

hobby purposes and model aircraft flown for any other purpose. There is no indication anywhere in AC 91-57 that any specific authorization is required for model aircraft operation. Nor does it even suggest that *any* regulations, such as those relating to pilot certification or airworthiness, are applicable to model aircraft.

The FAA has in more recent years expressly reaffirmed the lack of regulations. In August 2001, an inquiry was made by a company concerning its proposed use of "radio controlled blimps and aircraft" up to 22 feet in length operated in Class B airspace for purposes of commercial aerial photography.[10] Exhibit F. The request for a "ruling" was escalated from the Dallas-Ft. Worth Tower to the Manager of the Air Traffic Division and then to Michael A. Cirillo, Program Director for Air Traffic Planning and Procedures in the Washington D.C office. In November 2001, Mr. Cirillo responded in a memorandum addressing "radio controlled airships and aircraft [that would] operate in Class B airspace." That memorandum confirms:

> The aircraft described and pictured in the attachments to your memorandum appear to be model aircraft that do not require compliance with Federal Aviation Regulations. Model aircraft do not require a type certificate, airworthiness certificate, or registration. Federal Aviation regulations do not apply to them. Specifically, 14 Code of Federal Regulations (CFR) Part 21, Certification Procedures for Products and Parts; 14 CFR Part 43, Maintenance, Preventative Maintenance, Rebuilding and Alteration; and 14 CFR 91, General Operating and Flight Rules, do not apply to model aircraft. Model aircraft may operate in controlled airspace without air traffic control authorization, transponders, or altitude reporting equipment.

Exhibit G (emphasis added). This same guidance was reiterated to the business owner again in 2004. Exhibit H.[11]

In 2007, however, the FAA issued a new policy memorandum defining "unmanned aircraft" to include "a remotely controlled model aircraft" of any size, and stated:

> The current FAA policy for UAS operations is that no person may operate a UAS in the National Airspace System without specific authority. For UAS operating as

---

[10] Class B airspace is defined as "that airspace from the surface to 10,000 feet MSL surrounding the nation's busiest airports in terms of IFR operations or passenger enplanements." *See* FAA Aeronautical Information Manual, Section 3-2-1, *available at* https://www.faa.gov/air_traffic/publications/atpubs/aim/aim0302.html .

[11] The status of model aircraft as "unregulated flying devices" was also repeatedly confirmed by the FAA's very own researchers in 2009. In September 2009, the FAA sponsored and published an "Unmanned Aircraft System Regulation Review" performed by the Center for General Aviation Research (CGAR). Exhibit I, Final Report No. DOT/FAA/AR-09/7, *available at* www.tc.faa.gov/its/worldpac/techrpt/ar097.pdf

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

Marc L. Warren, Esq.
March 17, 2014
Page 8

public aircraft the authority is the COA, for UAS operating as civil aircraft the authority is special airworthiness certificates, and for model aircraft the authority is AC 91–57. The FAA recognizes that people and companies other than modelers might be flying UAS with the mistaken understanding that they are legally operating under the authority of AC 91–57. AC 91–57 only applies to modelers, and thus <u>specifically excludes its use by persons or companies for business purposes.</u>

*Id.* (emphasis added)   This new policy position apparently applies not only to Class B airspace, but to <u>any</u> airspace, anywhere, down to one inch above the ground. *See* Exhibit B at "Myth #3."

The new "specific authority" requirement for model aircraft and the "business purpose" prohibition have no basis in any regulation. Because they are articulated only in a policy statement, not a regulation issued pursuant to the APA Section 553 notice-and-comment rulemaking process, they are unenforceable, as recently held by an NTSB administrative law judge in the matter of *Huerta v. Pirker*, CP-217 at p. 4 (NTSB, Decisional Order, March 6, 2014) (the FAA "has not issued an enforceable FAR regulatory rule governing model aircraft operation") (notice of appeal filed). Exhibit J.[12]

Even the COA and experimental waiver process for UAS is based on policy, not regulation. The FAA issued, and continues to update, notice of National Policy N 8900.207, with the subject "Unmanned Aircraft Systems (UAS) Operational Approval."[13] This 43-page document purports to set out "best practices and procedures that have been used by FAA in prior approvals for UAS applications for COAs or special airworthiness certificates." However, the document expressly states that "it is not meant as a substitute for any regulatory process." It is therefore not binding on anyone. Instead, the Department of Transportation currently indicates that the very first notice of proposed rulemaking for small UAS (weighing under 55 pounds) will not be published for comment until November 2014. *See* Report on DOT Significant Rulemakings, *available at* http://www.dot.gov/regulations/report-on-significant-rulemakings .

Even if the 2007 Notice were somehow binding on model aircraft operators, which it is not, the operations conducted by the Texas EquuSearch Team fall outside of any restrictions articulated by the FAA. The Team does not use the model aircraft for any "business" purpose. The purpose is purely humanitarian: to save a life when possible, and to ease the suffering of families by bringing closure when that life can no longer be saved. The distinction that the FAA now draws between Texas EquuSearch's use, and that of a hobbyist, is entirely arbitrary and

---

[12] The invalidity of the 2007 Notice is reflected in a letter sent by an FAA official to a member of Congress in 2009. Exhibit K. Mr. Allen's letter first admits that, historically, the federal aviation regulations have never applied to model aircraft. Exhibit D at p. 2.

[13] *Available at* http://www.faa.gov/documentlibrary/media/notice/n%208900.207.pdf

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

Marc L. Warren, Esq.
March 17, 2014
Page 9

capricious, and in violation of the Administrative Procedures Act and due process principles. There is no basis whatsoever, in law, in policy, or in common sense, to prohibit the operation of a model aircraft for volunteer search and rescue activities.

**Request for Relief**

The FAA's Mission Statement and Core Values, featured on its website, read in part:

• Integrity is our touchstone. We perform our duties honestly, with moral soundness, and with the highest level of ethics.

• Innovation is our signature. We foster creativity and vision to provide solutions beyond today's boundaries.[14]

• We do the right thing, even if no one is looking.[15]

We hope that you will do the right thing now.  We urge you to overturn the FAA's February 21st order or direct that the Administrator expressly rescind it within 30 days of the date hereof.  Otherwise, we intend to pursue all available legal remedies. In order to stop further harassment by telephone, we also ask your office to confirm in a written Legal Interpretation that model aircraft operations for volunteer search and rescue purposes are not currently prohibited by any federal aviation regulation.

Very truly yours,

Brendan M. Schulman

BMS:rl
Enclosures

---

[14] http://www.faa.gov/about/mission/

[15] http://www.faa.gov/about/initiatives/sms/specifics_by_aviation_industry_type/the_regulator/

UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

APR 21 2014

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED

APR 21 2014

CLERK

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT



TEXAS EQUUSEARCH MOUNTED )
SEARCH AND RECOVERY TEAM, )
RPSEARCH SERVICES INC., and )
EUGENE ROBINSON, )
)
        Petitioners )
)
        v. )
)
FEDERAL AVIATION )
ADMINISTRATION, )
)
        Respondent )

Case No. 14-1061

## RULE 26.1 CORPORATE DISCLOSURE STATEMENTS

Texas EquuSearch Mounted Search and Recovery Team (Texas
EquuSearch) is a Texas Corporation, formed as a non-profit corporation the Texas
Non-Profit Corporation Act, and registered with the Internal Revenue Service as a
Section 501(c)(3) public charity. Texas EquuSearch has no parent company and is
not publicly traded.

RPSearch Services Inc. is a Texas Corporation, formed as a non-profit
corporation under the Texas Non-Profit Corporation Act, and registered with the
Internal Revenue Service as a Section 501(c)(3) public charity. RPSearch

Services Inc. has no parent company and is not publicly traded.

Date: April 18, 2014         KRAMER LEVIN NAFTALIS & FRANKEL LLP

Brendan M. Schulman

1177 Avenue of the Americas
New York, NY 10036
Tel: (212) 715-9100
Fax: (212) 715-8220
Email: BSchulman@KramerLevin.com

*Attorneys for Petitioners*